WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jose Madrigal, et al., | No. cv-06-2914-PHX-ROS |
| Plaintiffs, | **ORDER** |
| vs. | |
| Rafael N. Mendoza, et al., | |
| Defendant. | |

Pending before the Court is the Defendant United States of America's Motion for Summary Judgment (Doc. 96), which argues that Plaintiffs' expert witness must be excluded and, as a consequence, the case against Defendant dismissed. For the reasons stated herein, Defendant's motion will be granted.

## BACKGROUND

Plaintiff Maria Elena Madrigal was pregnant with her eighth child. In her six previous pregnancies (one of which resulted in twins) she had no complications during labor and delivery. All her prenatal care during the instant pregnancy took place at Clinica Adelante, a federally supported clinic. Her prenatal care was provided by Dr. Rafael Mendoza, Dr. Ajaz Rahaman, and Marcia Brickson, a nurse practitioner, all federal employees against whom any claim is covered under the Federal Tort Claims Act.

On November 26, 2002 then 36 weeks pregnant, Maria Madrigal had an ultrasound study that estimated the baby's weight at 4,172 grams (9 pounds, 3 ounces), plus or minus

743 grams. She was also found to be non-diabetic. She was offered an early induction of labor at 37 weeks with amniocentesis to confirm lung maturity or a planned induction at 39 weeks otherwise. She chose an induction at 39 weeks.

On December 10, 2002, Dr. Mendoza induced labor. That afternoon he went off duty and Dr. Rahaman assumed care until around 4:00pm when Dr. Forest took night call for the Clinica patients. As Dr. Forest delivered the baby, the delivery was complicated by the development of a shoulder dystocia, a condition that generally occurs when the infant's shoulder becomes wedged behind the mother's pelvic bone. Dr. Forest performed a number of maneuvers and delivered the baby, Melissa Madrigal, weighing 4,821 grams, or 10 pounds, 10 ounces.

At birth, Melissa Madrigal had a brachial plexus injury. This injury is a reasonably common consequence of shoulder dystocia and can be, but is usually not, permanent. Plaintiffs allege that Melissa Madrigal's injury is permanent and that, as a result, she has only about 20% use of her left arm. They brought suit alleging that her injury is the result of medical negligence during the delivery – in particular, that Maria Madrigal should have been offered a cesarean section and that improper traction was used during delivery.

## STANDARD OF REVIEW

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In addition, the dispute must be genuine; that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (internal quotations and citations omitted). The party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party; "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. at 255. Therefore, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. Id.

ANALYSIS

Under the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 589 (1993). The obligation is centered around F.R.E. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"Scientific" knowledge, the Supreme Court has found, is not meant to denote absolute certainty – "[i]nstead, it represents a *process* for proposing and refining theoretical explanations about the world that are subject to further testing and refinement." Id. at 590 (quoting Brief for American Association for the Advancement of Science et al. as *Amici Curiae* 7-8) (emphasis in original). "[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method.." Id. This determination is

not narrowly circumscribed, but specific factors that will often bear on the admissibility of a particular theory or technique include:

> 1) whether it "can be (and has been) tested;" Id. at 593.
> 2) whether it "has been subjected to peer review and publication." Id.
> 3) the known or potential rate of error. Id. at 594.
> 4) whether it is generally accepted within the relevant scientific community. Id.

These factors may be relevant to experience-based testimony as well as the more abstract application of scientific principles. Kumho v. Tire Co. v. Carmichael, 526 U.S. 137, 151 (1999). However, a district court need not consider all factors in all cases; "[r]ather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." Id. at 142. Expert opinions may be based on otherwise admissible hearsay so long as the facts and data "are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." F.R.E. 703.

There is no question that Dr. Leviss has the background and experience necessary for an expert witness. In particular, he has an M.D., is board certified in Obstetrics and Gynecology, and has served as a clinical instructor in such at the Albert Einstein College of Medicine and the University of Medicine and Dentistry of New Jersey (where he is still on the faculty).

His opinions, however, do not pass muster under F.R.E. 702. Plaintiffs admit, for purposes of this motion, Defendant's allegations that "[m]edical studies have demonstrated that shoulder dystocia and brachial plexus injuries are generally not predictable or preventable." Def. SoF, ¶ 13. Further, they admit that the American College of Obstetricians and Gynecologists ("ACOG") is the leading professional group for women's health care providers in the United States and that its publications are often cited as evidence of the standard of care. The ACOG Practice Bulletin on Shoulder Dystocia states that it is "most often an unpredictable and unpreventable obstetric emergency." Def.'s Ex. C. It states also that a significance proportion – 34-47% – of brachial plexus injuries, the kind of injury suffered by Melissa Madrigal, are not associated with shoulder dystocia; 4% occur after

cesarean delivery. Id. Fetal macrosomia and maternal diabetes increase the risk of shoulder dystocia, but "[i]n one study, the presence of both diabetes and macrosomia accurately predicted only 55% of cases of shoulder dystocia." Id.

> The ACOG also notes that
> [a] small, randomized trial of 273 patients with an ultrasound-estimated fetal weight of 4,000-4,500 g comparing labor induction with expectant management reported no significant difference in the rate of shoulder dystocia (3.7% versus 4.3%) or brachial plexus palsy (0% versus 1.4%).

Id. Further:

> A policy of planned cesarean delivery for suspected macrosomic fetuses (>4,000 g) in women who do not have diabetes is not recommended. Ultrasonography is not an accurate predictor of macrosomia. Furthermore, most macrosomic infants do not experience this complication. Consequently, if all fetuses suspected of being macrosomic underwent cesarean delivery, the cesarean delivery rate would increase disproportionately when compared with the reduction in the rate of shoulder dystocia. . . . Although the diagnosis of fetal macrosomia is imprecise, prophylactic cesarean delivery may be considered for suspected fetal macrosomia with estimated fetal weights greater than 5,000 g in women without diabetes and greater than 4,500 g in women with diabetes.

Id.

Other studies, one literature review found, concur that "[a]lthough brachial plexus palsy is frequently associated with shoulder dystocia, evidence suggests that its occurrence may, in some instances, antedeate the time of delivery." Def.'s Ex. J. The same article concludes that "[t]o date, no management algorithm involving selective interventions based on estimates of fetal weight has demonstrated efficacy in reducing the incidence of either shoulder dystocia or brachial plaxis injury." Hence, "incorporating estimates of fetal weight in the care of nondiabetic pregnant women deemed at risk for macrosomic neonates seems to be unspported." Id. Similarly, another such review found that "[i]nduction of labor for suspected macrosomia has not been shown to alter the incidence of shoulder dystocia among nondiabetic patients." Def's Ex. K. The same review noted that "[t]he concept of prophylactic cesarean delivery as a means to prevent shoulder dystocia and therefore avoid brachial plexus injury has not been supported by either clinical or theoretical data." Id. One study, for instance, found that "2,345 to 3,695 cesarean deliveries would need to be performed to prevent one permanent brachial plexus injury among nondiabetic women." Id.

Similarly, "[r]etrospective assessment of a policy that recommended cesarean delivery for fetal weight of more than 4,500 g found an insignificant effect in the incidence of brachial plexus palsy." Id. However, the paper also notes that part (though not all) of this is due to "the fact that 84% of patients did not have the macrosomia diagnosed before birth," and therefore the conclusions may not hold as strongly where macrosomia *was* diagnosed before birth.

In its recommendation section, the ACOG Report states that the McRoberts technique is an appropriate first response to shoulder dystocia.

In deposition (as well as his report) Dr. Leviss was critical of Dr. Forest's technique, stating:

> if the maneuvers that he describes were done properly, then, in fact, in my experience and reading the literature and going to medical meetings and stuff, that he would not have effected an evulsion, permanent injury to the brachial plexus. . . . At worst she might have had a transient C5 or C6 palsy which would have resolved; because we know that when a little traction is used, it is possible to get a temporary in the nursery which resolves.

Levis Dep., 48. He also states in deposition that the McRoberts technique was improper, but admits that it is the standard of care. Leviss Dep., 45.

This opinion – that proper performance of the maneuvers in question would prevent brachial plexus injury – is not supported by the scientific evidence presented. Nor does Dr. Leviss even attempt to claim it is, admitting that he can't speak to that "globally for any prospective case." Leviss Dep. 56.

In his report, Dr. Leviss also states that "improper traction was employed by Dr. Forest prior to the maneuvers, which ultimately produced delivery, and that this traction produced a brachial plexus injury on the left side of Melissa Madrigal." Any sort of traction in cases of known or suspected fetal macrosomia, he states, is inappropriate and can lead to shoulder dystocia. Def.'s Ex. M. Dr. Leviss does not provide the basis for that opinion in his report. In deposition, however, it appears that Dr. Leviss's opinion is, once again, premised on his conclusions that, had the maneuvers in question been done without traction, the injury would not have occurred. Leviss Dep., 48-50. This does not, however, comport

- 6 -

with the evidence described above which shows brachial plexus injuries as occasionally occurring even in births by cesarean. And Dr. Leviss gives no basis for his opinion that this birth is one where brachial plexis could not have occurred but for improper traction. This Court cannot accept expert opinions without being able to assess the basis behind them. Kumho Tire, 526 U.S. at 149.

Dr. Leviss's report also takes issue with the decision to induce labor, discussing the Bishop scoring system on which a total score of more than 8 indicates that "the probability of vaginal delivery after labor induction is similar to that after spontaneous labor." Accordingly, "a Bishop score of 3 [as Maria Madrigal had] is a poor prognosis for successful vaginal delivery in the face of known fetal macrosomia." As far as can be read from Dr. Leviss's report – all this Court has to go on – the quoted text speaks to the possibility of cesarean section after induction, not to shoulder dystocia or brachial plexus. Dr. Leviss's report, therefore, provides no recognizable support for the proposition that induction contributed to Melissa Madrigal's injury. Further, this proposition is contrary to that in the literature supplied by Defendant, which suggests induction contributes neither positively nor negatively to shoulder dystocia.

Finally, Dr. Leviss is critical of Dr. Mendoza for not offering a cesarean section for fetal macrosomia. As discussed above, the medical evidence presented to this Court uniformly suggests that a policy of prophylactic cesareans is inappropriate in this context. Dr. Leviss provides no basis suggesting that his contrary opinion is reliable.

Plaintiffs' counter-arguments in support of Dr. Leviss's testimony are not persuasive. While it is true that studies submitted by Defendant need not – and cannot – be accepted as true by the Court without qualification, Plaintiffs have failed to present contradictory reliable evidence that supports Dr. Leviss's opinions and demonstrates any kind of serious debate in the medical community. Similarly, while Plaintiffs are correct that guidelines may not apply equally to every patient, they give no reason why *this* mother is an exception to the general rules that define standard of care. Nor are conclusory statements to the effect that the mere fact of injury demonstrates a violation of the standard of care, when the scientific evidence

1 before this Court states that the injury in question occurs unpredictably. Also unsupported
2 are Dr. Leviss's statements that the medical literature contrary to his position is biased,
3 unresearched, and industry funded.

4       Accordingly, Dr. Leviss's opinions lack the indicia of reliability that this Court is
5 required to look at and shall be excluded.

6       Arizona law states that to prove an injury resulted from the failure of a health care
7 provider to follow the accepted standard of care, a plaintiff must demonstrate both:

> 1. The health care provider failed to exercise the degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession of class to which he belongs within the state acting in the same or similar circumstances, [and that]
> 2. Such failure was a proximate cause of the injury.

A.R.S. § 12-563. Defendant points out that a plaintiff must ordinarily demonstrate both elements through expert medical testimony. See, Barrett v. Harris, 86 P.3d 954, 958 (Ariz. Ct. App. 2004) ("Ordinarily, a plaintiff in a medical malpractice lawsuit must prove the causal connection between an act or omission and the ultimate injury through expert medical testimony, unless the connection is readily apparent to the trier of fact."). Here, such a connection is not readily apparent, nor have Plaintiffs provided any evidence outside of the testimony of Dr. Leviss that might demonstrate that the health care providers in question "failed to exercise the degree of care, skill and learning expected of a reasonable, prudent health care provider." Only their contention that the doctors on call should have been informed of Plaintiff's suspected fetal macrosomia and a follow-up ultrasound been performed to determine fetal weight comes close. However, as Melissa Madrigal was, in fact, under the 5,000 grams that the ACOG manual recommends for prophylactic cesareans, there is no evidence that the failure to perform such an ultrasound was a proximate cause of the injury or that the standard of care would have led or required the doctors involved to change course. Accordingly,

**IT IS ORDERED** Defendant's Motion for Summary Judgment (Doc. 96) is **GRANTED**.

DATED this 23rd day of July, 2009.

_____
Roslyn O. Silver
United States District Judge